960 A.2d 779 (2008)
404 N.J. Super. 105
Sophie BUBIS, Plaintiff-Appellant,
v.
Jack KASSIN and Joyce Kassin, Defendants-Respondents.
DOCKET NO. A-5783-06T2.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 2008.
Decided December 11, 2008.
*781 Leonard S. Needle, Fair Haven, argued the cause for appellant.
David C. Apy, Princeton, argued the cause for respondents (Saul Ewing LLP, attorneys; Mr. Apy, of counsel and on the brief; George Tenreiro, on the brief).
Anne Milgram, Attorney General, attorney for amicus curiae State of New Jersey (Lewis A. Scheindlin, Assistant Attorney General, of counsel; Lisa Daglis and Dean Jablonski, Deputy Attorneys General, on the brief).
Before Judges SKILLMAN, GRAVES and GRALL.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
This appeal involves the applicability of the public trust doctrine to private oceanfront property the owners maintain exclusively for their own recreational enjoyment.
In 1995, defendants Jack and Joyce Kassin bought an oceanfront property in the Village of Loch Arbour that the previous owners had operated as a commercial beach club. This property has approximately 650 feet of frontage along the Atlantic Ocean and is approximately 300 feet in depth, with a total area of slightly less than five acres. The property is occupied by a large gravel parking lot, a substantial structure the Kassins refer to as the cabana building, tiki huts located on the beach, tables, a volleyball court, a children's playground, and other amenities. In the summer, the Kassins employ lifeguards to supervise swimming in the area of the oceanfront designated for this purpose.
The remainder of the oceanfront in Loch Arbour, which has approximately 350 feet of frontage along the Atlantic Ocean, is a public beach owned and operated by the municipality, which has restrooms, changing facilities and a refreshment stand. During the summer season, a beach badge is required to use this facility.
Plaintiff Sophie Bubis is the owner of a single-family residence located directly to the west of the Kassins' property, across a public street called Ocean Place. Mrs. Bubis has engaged in protracted litigation with the Kassins over the last thirteen years with respect to both her right to an ocean view from her residence and her right of access to the beach across the Kassins' property. This litigation has resulted in three published opinions: Bubis v. Kassin, 323 N.J.Super. 601, 733 A.2d 1232 (App.Div.1999) (Bubis I); Bubis v. Kassin, 353 N.J.Super. 415, 803 A.2d 146 (App.Div.2002) (Bubis II), and Bubis v. Kassin, 184 N.J. 612, 878 A.2d 815 (2005) (Bubis III).
One section of our opinion in Bubis II upheld a trial court order that allowed the Kassins to block Mrs. Bubis' access to the beach across the center of their property along a paper street called Edgemont Avenue, but conditioned that denial upon the Kassins providing alternative public access to the beach. 353 N.J.Super. at 424-26, 803 A.2d 146. The Kassins complied with this order by constructing a wooden eight-foot-wide pathway from the street to the beach along the southern boundary of their property.
On June 27, 2004, Mrs. Bubis walked with a beach chair and umbrella from her home to the beach by means of this pathway. She then walked along the beach below the mean high water line to a location in front of one of the Kassins' tiki *782 beach huts and sat down on her beach chair. A lifeguard employed by the Kassins asked her to move but she refused. Mr. Kassin then summoned the police, who also advised Mrs. Bubis that she had to move because "she [was] on private property." However, Mrs. Bubis again refused. The police prepared a complaint and summons for defiant trespass, in violation of N.J.S.A. 2C:18-3(b)(1), which Kassin signed. When the police served the summons, Mrs. Bubis informed them that "she has the right to use the beach at the high water mark according to the Public Trust Act[.]" After some further debate with the police officers, Mrs. Bubis packed her belongings and left the beach.
This incident precipitated a motion by Mrs. Bubis for enforcement of litigant's rights in which she alleged that the Kassins had interfered with her rights under the public trust doctrine and sought to enjoin them "from further interfering with [her] right to obtain access to, walk upon, sit, sunbathe and enjoy recreational activities on any portion of the foreshore including a portion of the dry sand beach area adjacent to the foreshore[.]" Mrs. Bubis also sought removal to the Chancery Division of the municipal court trespass complaint Mr. Kassin had filed against her as well as two municipal court complaints for harassment she had filed against the Kassins.
The trial court granted the part of Mrs. Bubis' motion that sought removal of the municipal court complaints to the Chancery Division, but deferred proceeding on those complaints until after a resolution of her motion for relief in aid of litigants' rights. The court conducted an evidentiary hearing on the motion at which Mrs. Bubis, Mr. Kassin and other witnesses testified. Only a brief summary of the evidence presented at that hearing is required to address the issues presented by this appeal.
Loch Arbour public officials who manage the municipal beach testified that the beach occasionally fills on weekends to a point where the sale of beach badges is suspended. One official estimated that such overcrowding had occurred only twelve times in the previous ten years. These officials also testified that they have an informal arrangement with Mr. Kassin under which he allows patrons of the municipal beach to use an approximately 100 foot section on the northern part of his beach on weekend days when the municipal beach is overcrowded.
The head lifeguard employed by the Kassins testified that he asks any person who places a chair in the sand in front of the Kassins' tiki beach huts to move the chair so as not to obstruct the Kassins' view of the ocean. This apparently was the area where Mrs. Bubis placed her beach chair on the day she was charged with trespass.
Based on this evidence, the trial court issued a lengthy written opinion upholding the Kassins' position that Mrs. Bubis and other members of the public have only a limited right under the public trust doctrine to use the Kassins' private oceanfront property and the adjoining land below the mean high water mark. The court concluded that the Kassins are not obligated to provide any public access to the area of their property above the mean high water mark beyond the access already provided to the northern part of their beach on crowded weekend days:
The unrefuted evidence is clear, the use of the dry sand portions of the Kassins' property by the public would materially interfere with and destroy the character and beneficial use of their property. Use of the dry sand portions of the property by the public, where *783 there is no "legal need," significantly interferes with the ability of Mr. and Mrs. Kassin to ensure the safety and peace of their children, grandchildren, family members and guests and enjoy their private property rights.
The trial court also concluded that the Kassins could limit the public's use of the area below the mean high water mark, which the court referred to as the foreshore:
Mrs. Bubis has failed to establish the public right to unlimited use of the foreshore.... The public's right to use the ocean must be balanced and carefully weighed against the private owner's property rights.... The Kassins have a right in the foreshore adjacent to their property separate and distinct from that of the general public.
Based on these conclusions, the trial court imposed significant limitations on the public's use of both the upland sand area owned by the Kassins and the adjoining area below the mean high water mark:
Based upon the proofs offered at trial, the inspection of the area, and the unique characteristics of the Kassins' property, the Court holds that only a very limited use of the Kassins' property is mandated by the Public Trust Doctrine. That limited use shall include the right to walk, fish, surf, and engage in similar recreational activities and the right to reasonable, short rest periods in the foreshore. Ancillary to the foreshore rights, the public may also use the Kassin dry sand beach for reasonable, short rest periods while engaging in permitted activities.
These reasonable resting rights extend to the foreshore and a 6-foot wide area of dry sand immediately adjacent to the mean high water line.... The public does not have the right to place a beach chair, umbrella, or other beach paraphernalia, engage in sunbathing activities, or rest for other than a reasonable time in the foreshore or the 6-foot strip of dry sand.
In addition, the court concluded that members of the public should not be allowed even to stop for rest in a 200-foot area directly in front of the Kassins' cabana building, which the court designated as the "no rest zone":
The reasonable resting rights in the foreshore and dry sand area shall not interfere with the Kassins' use of their private property. Therefore, those rights may not be exercised in a 200 foot area directly in front of the Kassin cabana. The "no rest zone" shall extend 200 feet to the north of the southern corner of the cabana.
Mrs. Bubis appeals from the judgment memorializing these rulings. The Kassins have not cross-appealed.
We conclude that the trial court erred in imposing significant limitations upon the public's right to use the area below the mean high water mark adjoining the Kassins' property. However, we also conclude that the public trust doctrine does not extend to a right of public access to a private oceanfront property, such as the Kassins' property, which is not devoted to public use. Accordingly, we reverse the part of the judgment that imposes limitations upon the public's use of the beach below the mean high water mark, but affirm the part of the judgment limiting the public's use of the upland sand area.

I.
Initially, we note that the property of an owner of oceanfront property only extends to the high water mark. The property below that line is owned by the State in trust for its citizens. See Borough of Neptune City v. Borough of Avon-bythe-Sea, *784 61 N.J. 296, 303-06, 294 A.2d 47 (1972).
Moreover, the public's right to use oceanfront property held in trust by the State extends to "recreational uses, including bathing, swimming and other shore activities." Id. at 309, 294 A.2d 47; accord Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 228, 430 A.2d 881 (1981); Van Ness v. Borough of Deal, 78 N.J. 174, 179, 393 A.2d 571 (1978). These rights of public use of the land below the mean high mark are not dependent upon whether the upland sand area is owned by a municipality or a private party. See Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc., 185 N.J. 40, 51-52, 879 A.2d 112 (2005); Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 323-25, 471 A.2d 355 (1984).
We have no doubt that an owner of private property adjoining land below the mean high water mark who assumes responsibility for public safety in that area may enforce reasonable regulations for this purpose. Cf. Van Ness v. Borough of Deal, supra, 78 N.J. at 179, 393 A.2d 571 (noting that a municipality that owned the upland sand area involved in that case "would have the right to adopt reasonable regulations as to the use and enjoyment of the beach area"). Thus, private property owners such as the Kassins can prohibit persons using the area below the mean high water mark from standing or placing a beach chair in a location that would obstruct their lifeguards' observations of swimmers.
However, owners of private property adjoining property held by the State under the public trust doctrine may not impose limitations upon the public's use of that property simply to enhance the enjoyment of their own property. Therefore, the Kassins violated Mrs. Bubis' rights when their lifeguard directed her to move her beach chair to ensure that the Kassins and their guests would have an unobstructed view of the ocean and then summoned the police to remove her from the area below the high water mark.
The only authority the trial court cited in support of its conclusion that "[t]he Kassins have a right in the foreshore adjacent to their property separate and apart from that of the general public," and therefore that the public's right to use public trust land may be restricted, was Marks v. Whitney, 6 Cal.3d 251, 98 Cal. Rptr. 790, 491 P.2d 374 (1971). However, the essential question presented in Marks was whether property below the mean high water mark that the State has granted to a private property owner is still subject to the rights of the public under the public trust doctrine.[1]See id. at 378-81. Because the State has not granted the Kassins any interest in the property below the high water mark adjoining their property, Marks does not support the trial court's conclusion that the Kassins have greater rights in the land below the mean high water mark than members of the general public.
For these reasons, the trial court erred in imposing limitations upon the right of Mrs. Bubis and other members of the public to use the land below the mean high water mark adjoining the Kassins' property.

*785 II.
We turn next to Mrs. Bubis' claimed right to use a portion of the upland sand area on the Kassins' property. The determination of this claim requires us to analyze the Supreme Court's decisions in Matthews, supra, 95 N.J. 306, 471 A.2d 355, and Raleigh Avenue Beach Association, supra, 185 N.J. 40, 879 A.2d 112.
In Matthews, the Court addressed the right of public access to an upland sand area occupied by a quasi-public association that operated a beach facility for residents of Bay Head. Specifically, the issue presented was whether the association could limit membership, which was required for access to the beach between 10 a.m. and 5:30 p.m. during the summer season, to Bay Head residents. 95 N.J. at 315, 471 A.2d 355.
Through the years, Bay Head had provided the association with a variety of financial and other support, including free office space in the Borough Hall, liability insurance, tax exemptions and direct municipal appropriations. See id. at 329-30, 471 A.2d 355. Based on this close relationship between the municipality and association, the Court stated: "When viewed in its totalityits purposes, relationship with the municipality, communal characteristics, activities, and virtual monopoly over the Bay Head beachfrontthe quasi-public nature of the Association is apparent." Id. at 330, 471 A.2d 355. The Court concluded that under these circumstances the Association was required to make membership available to both residents and nonresidents on a nondiscriminatory basis and also to provide a reasonable quantity of daily beach badges. Id. at 332, 471 A.2d 355.
Although the issue in Matthews was the right of public access to an upland sand area occupied by a quasi-public body with close ties to the municipality in which it was located, the Court posed the issue more broadly, as involving the right of public access to "privately-owned dry sand areas." Id. at 326, 471 A.2d 355. Moreover, the Court articulated a general test for determining when a right of public access to such an area may be required under the public trust doctrine:
Precisely what privately-owned upland sand area will be available and required to satisfy the public's rights under the public trust doctrine will depend on the circumstances. Location of the dry sand area in relation to the foreshore, extent and availability of publicly-owned upland sand area, nature and extent of the public demand, and usage of the upland sand land by the owner are all factors to be weighed and considered in fixing the contours of the usage of the upper sand.
[Id. at 326, 471 A.2d 355.]
However, the Court declined to decide whether all privately owned upland sand area must be open to the public to the same extent as the beach of a quasi-public association, stating:
Resolution of the competing interests, private ownership and the public trust, may in some cases be simple, but in many it may be most complex. In any event, resolution would depend upon the specific facts in controversy.
[Id. at 333, 471 A.2d 355.]
In Raleigh Avenue, the Court applied the principles set forth in Matthews to an upland sand area owned by a private beach club operated as a commercial business enterprise. The Court indicated that "[a]lthough decided on narrow grounds, Matthews established the framework for application of the public trust doctrine to privately-owned upland sand beaches." 185 N.J. at 54, 879 A.2d 112. The Court then considered each of the four factors it *786 had identified in Matthewsthat is, the "location of the dry sand area in relation to the foreshore," the "extent and availability of publicly-owned upland sand area," the "nature and extent of the public demand" for beach access and the "usage of the upland sand by the owner." Id. at 55-60, 879 A.2d 112. Applying these factors, the Court concluded that the upland sand area owned by the club "must be available for use by the general public under the public trust doctrine." Id. at 59, 879 A.2d 112.
In reaching this conclusion, the Court relied on various circumstances pertinent to the right of public access to a privately-owned beach under the Matthews factors, including the absence of a publicly-owned beach in the municipality where the club was located, id. at 56, 879 A.2d 112, a condition in a permit issued to the club owners under the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to-44, that required them to provide public access to 220 feet of beach, id. at 57-58, 879 A.2d 112, and the fact that the club was a "place of public accommodation" under the Law Against Discrimination, N.J.S.A. 10:5-1 to-42, which was thus required to be made available to the public without regard to race, creed, or color, id. at 59, 879 A.2d 112. The Court also held that the club could charge a reasonable fee approved by the DEP for use of its beach to defray the costs of operation and maintenance. Id. at 60-62, 879 A.2d 112. The Court summarized its reasons for holding that there was a right of public access to the upland sand area owned by the club: "In so holding we highlight the longstanding public access to and use of the beach, the ... CAFRA permit condition, the documented public demand, the lack of publicly-owned beaches in Lower Township, and the type of use by the current owner as a business enterprise." Id. at 59-60, 879 A.2d 112.
We conclude that the factors the Court relied upon in Raleigh Avenue do not support a right of public access to the upland sand area on the Kassins' property. We recognize that the Kassins' property was formerly owned by a commercial private beach club similar to the club involved in Raleigh Avenue. Consequently, there is some history of "public access to and use of the [Kassins'] beach." Ibid. However, unlike the municipality in which the private club involved in Raleigh Avenue was located, Loch Arbour has a publicly-owned beach. Ibid. Although that beach occasionally becomes filled to capacity on weekends, it is generally sufficient to satisfy the "public demand" for beach access in Loch Arbour. Ibid. Moreover, the Kassins never obtained a CAFRA permit that was conditioned upon allowing public access to some part of their beach. Ibid.
Most significantly, the Kassins do not use their property to conduct a "business enterprise." Ibid. Rather, they use the property solely for their own private enjoyment and the entertainment of family, friends and other invited guests. Our law has long recognized that property owners who use their land to conduct a commercial business enterprise assume certain legal obligations regarding unrestricted public access to that land. See, e.g., Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25, 33-36, 219 A.2d 161 (1966); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 487-88, 210 A.2d 208 (1965). However, if property owners use their land solely for their own private enjoyment, the government may not create a right of public access without payment of just compensation. See Nollan v. California, 483 U.S. 825, 831-32, 107 S.Ct. 3141, 3145-46, 97 L.Ed.2d 677, 685-86 (1987).
We also note that, unlike the commercial beach club involved in Raleigh Avenue, the Kassins do not charge any fee to the persons *787 they invite to use their beach facility. Consequently, if the general public were entitled to access to a portion of the Kassins' beach under the public trust doctrine, the Kassins would be placed in the position of operating what probably would be the only free beach in Monmouth County. Given the easy access to that beach provided by the pathway the Kassins were required to construct along the southern boundary of their property, such a beach would be likely to attract a substantial number of persons. Such public usage would not only detract from the Kassins' own enjoyment of their property but also add to their maintenance expenses, particularly the cost of keeping the beach clean.
We recognize that members of the public who use the property below the mean high water mark adjoining the Kassins' property also may take advantage of certain services provided by the Kassins, such as lifeguards, without paying any fee, which may add to the Kassins' costs of operation of their beachfront property. However, as discussed in section I of this opinion, the Kassins do not own or have any other property interest in the land below the mean high water mark. Therefore, any additional costs the Kassins may incur as a result of members of the public taking advantage of the services they provide in that area may be viewed as simply a quid pro quo for their own opportunity to use that State-owned public trust land without payment of any fee.
For all these reasons, we conclude that the public does not have any right of access to the upland sand area of the Kassins' property. Although the judgment that is the subject of this appeal grants a right of public access to a six-foot strip of the Kassins' property, the Kassins have not cross-appealed from that part of the judgment. Moreover, this right of access is extremely limited. Therefore, we do not disturb that part of the judgment.
Accordingly, we reverse the part of the judgment restricting the right of public access to the property below the mean high water mark adjoining the Kassins' property. We affirm the part of the judgment relating to the right of public access to the upland sand area of the Kassins' property.
NOTES
[1] This is the same issue discussed in Justice Hall's opinion in Borough of Neptune City v. Borough of Avon-by-the-Sea, supra, 61 N.J. at 307-09, 294 A.2d 47. The Supreme Court of California concluded in Marks, as Justice Hall did in Neptune City, that land below the mean water mark conveyed to a private party remains subject in certain circumstances to public rights under the public trust doctrine.